POSNER, Circuit Judge,
concurring in the court’s judgment and opinion.
I join the court’s opinion without reservations, and write separately only to raise two general questions about limitations periods in medical malpractice litigation (specifically litigation under the Federal Tort Claims Act) that while presented by this case do not have to be answered in order to decide it. Both relate to the discovery rule: the rule that federal statutes of limitations don’t begin to run until the prospective plaintiff discovers, or should have discovered, that he has been injured — and by whom. (See, with specific reference to medical malpractice suits under the tort claims act, United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).) The first question is the role of the tort concept of the “reasonable person” in deciding whether the plaintiff “should have” discovered the injury and by whom it was inflicted. The second question is the relation of an ethical duty of candor by medical staff to the “should have” question.
As a practical matter what used to be called the “reasonable man” concept in tort law, now unsexed to conform to modern sensibilities, means the average person; this is in recognition of the fact that “when men live in society, a certain average of conduct, a sacrifice of individual peculiarities going beyond a certain point, is necessary to the general welfare____ The law considers, in other words, what would be blameworthy in the average man, the man of ordinary intelligence and prudence, and determines liability by that.” O.W. Holmes, Jr., The Common Law 108 (1881); cf. United States v. Slaight, 620 F.3d 816, 821 (7th Cir.2010); Boim v. Holy Land Foundation for Relief & Development, 549 F.3d 685, 693 (7th Cir.2008) (en banc); United States v. Notorianni, 729 F.2d 520, 522 (7th Cir.1984). So negligence is failure to take the care that the average person would have taken in the defendant’s position, and contributory or comparative negligence is failure to take the care that the average person in the plaintiffs position would have taken.
Prosser and Keeton call the reasonable person “a fictitious person, who never has existed on land or sea: the ‘reasonable man of ordinary prudence’ [is] .... an ideal individual.” W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 32, p. 174 (5th ed.1984). But the key word is “ordinary”: the required level of care has to be within the average person’s ability to attain. Moreover, exceptions are allowed: a blind person is not held to the level of care of a sighted one. Fletcher v. City of Aberdeen, 54 Wash.2d 174, 338 P.2d 743, 745-46 (1959); Davis v. Feinstein, 370 Pa. 449, 88 A.2d 695 (1952); Richard A. Epstein, Torts § 5.10, p. 121 (1999); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 11(a) (2005); Holmes, supra, at 109. A blind person who, while using the blind person’s white cane, is hit at an intersection, when a sighted person would easily have dodged the vehicle hurtling toward him driven by the defendant, is not deemed negligent if he was being as careful as it is reasonable to expect a blind person to be, bearing in mind the cost to the blind of holding them *674 to the same standard of care in crossing streets as sighted persons. Otherwise a blind person would lose the protection of tort law when he ventured to cross a street.
The goal of the average-person rule (to give it the more perspicuous name), in instrumental terms, is to provide an additional incentive, beyond that of moral duty or concern with personal safety, to avoid injuring people (or being injured). A driver who falls below the average of care, and as a result injures someone, is subject to tort liability; it is hoped that the threat will motivate drivers to be careful to avoid injuring others (or themselves). Epstein, supra, § 5.2. Similarly, a pedestrian who falls below the average of care, and would not have been injured had he not done so, cannot obtain damages (full damages, and in some states — see, e.g., Robinson v. McNeil Consumer Healthcare, 615 F.3d 861, 865 (7th Cir.2010) (Virginia law) — any damages) even if his injurer also failed to exercise the care of an average person.
But this motivational system works only if potential injurers and potential victims are capable of exercising the care of the average person, or if incapable can at least avoid situations in which they are likely to cause or suffer injury. Drivers have to be licensed, and this excludes, in principle anyway, the least competent persons. And persons licensed to drive but nonetheless unskilled can avoid accidents by driving slowly or avoiding night driving and dangerous roads, or by not driving at all. Similarly, financially unsophisticated persons don’t have to buy financial instruments, so all buyers of such instruments can properly be held to the standard of care of the average buyer. Moreover, if the law held unsophisticated buyers to only a lower standard, it would in effect be subsidizing them and thus encouraging the entry of financially unsophisticated persons into those markets.
“Care” thus connotes both the level of performance that the law requires and the set of compensatory measures that persons who are clumsy or inexperienced can use to attain a level of care that the average person attains with less effort. But a blind person, no matter how careful he tries to be, cannot cross a street as safely as a sighted person unless he can afford to hire an escort. Holding him to the standard of care of a sighted person would just discourage him from going out of his house, and this is thought an excessive cost (in contrast to forbidding blind people to drive); it “could lead to levels of social isolation that are no longer found acceptable.” Epstein, supra, § 5.2, at 113.
True, there isn’t an exception to the average-person standard for all types of person incapable of taking the care of the average person. There is not, for example, for the insane (beyond a narrow exception for a sudden, unforewarned insane fit, see Breunig v. American Family Ins. Co., 45 Wis.2d 536, 173 N.W.2d 619, 624 (1970)). The hope is that the family, or the authorities, will keep persons known to be insane out of mischief, Restatement (Third) of Torts, supra, § 11(c); and the incentive to do so will be somewhat greater if the insane person is held to the standard of the average person. Then too mental illness is more difficult to diagnose than blindness and its relation to the commission of a negligent act more difficult to determine.
There is no way in which holding the Arroyos, who seem to be typical clients of the Erie Family Health Center, to the level of medical knowledge of the average person in American society could make them as knowledgeable as such a person. That would be almost as unrealistic as ruling that the statute of limitations in a medical malpractice suit begins to run whenever a patient who had been trained *675 as a physician would have discovered that he had been injured as a result of a medical act or omission, though the actual plaintiff had no medical training. Which is not to say that contributory (or comparative) negligence has no role to play in medical malpractice cases. Drugs come with warnings; due care requires reading the warnings, provided they are intelligible to the average person. See, e.g., Robinson v. McNeil Consumer Healthcare, supra. Everyone knows one should read warning labels, though, like the plaintiff in the Robinson case, many do not.
In applying the discovery rule, which governs when a federal claim accrues in the sense of starting the running of the period allowed by the statute of limitations for bringing suit, courts generally use the same average-person standard they use in determining negligence and contributory negligence. Compare In re Signal Int’l, LLC, 579 F.3d 478, 491-92 (5th Cir.2009) (negligence), with Nemmers v. United States, 795 F.2d 628, 631 (7th Cir.1986) (discovery in malpractice suit under Federal Tort Claims Act); Valdez ex rel. Donely v. United States, 518 F.3d 173, 177-78 (2d Cir.2008) (same), and Callahan v. United States, 426 F.3d 444, 451 (1st Cir.2005) (same); cf. Fries v. Chicago & Northwestern Transportation Co., 909 F.2d 1092, 1095 (7th Cir.1990) (discovery in other federal suits); Each v. Hose, 589 F.3d 626, 634 (3d Cir.2009) (same). And typically they state the standard without qualification. But such statements should be treated as generalities open to exception, in conformity with Holmes’s overstated but illuminating observation that “general propositions do not decide concrete cases. The decision will depend on a judgment or intuition more subtle than any articulate major premise.” Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (dissenting opinion). Judicial opinions would be unreadable if every proposition of law stated in them was embellished with every conceivable qualification necessary to make the proposition exactly and everywhere a true statement of the law. When judges recite the average-person rule of tort law, they do not bother to list its exceptions, such as the exceptions for blind people, other than ones that might be applicable to the case at hand. To omit to mention a qualification is not to reject it.
When knowing a fact depends on having technical knowledge, the incredible variance in such knowledge across American society can make the knowledge of the average person a perverse benchmark. Mrs. Arroyo had an infection (Group B Streptococcus), benign to her, when she entered the hospital to give birth. The birth seemed uneventful, but it was soon discovered that the infection had been communicated to her newborn during childbirth, causing the terrible injuries described in the court’s opinion. Had she been a doctor, she would have suspected that the communication of her infection to the child during childbirth might have been preventable, and this suspicion in turn would have impelled her to investigate whether the failure of prevention had reflected a lack of due care and borne a causal relation to the child’s injuries. See Centers for Disease Control and Prevention, “Prevention of Perinatal Group B Streptococcal Disease,” Morbidity and Mortality Weekly Report, Nov. 19, 2010, www.cdc.gov/mmwr/pdf/rr/rr5910.pdf. (visited July 26, 2011, as are the other web citations in this opinion). And similarly if her husband had been a doctor.
The Arroyos’ baby was delivered at Northwestern Memorial Hospital by an obstetrician employed by the Erie Family Health Center in Chicago, and the baby’s initial care was by a pediatrician also employed by the Center. The mother was a patient at Erie’s West Town Health Cen *676 ter, which is located in a neighborhood that is 47 percent Hispanic. Erie’s website explains that its goal is “to deliver quality health care to Chicago’s medically underserved communities with compassion and respect.” Erie Family Health Center, “About Erie,” www.eriefamilyhealth.org/ about-erie. Eighty-four percent of the Center’s patients are Hispanic, 62 percent “are best served in Spanish,” 34 percent are uninsured, and 86 percent “come from households with incomes that fall below the Federal Poverty Line.” The Arroyos are Hispanic (Mrs. Arroyo does not speak English) and poor (her medical bills were paid for by “Public Aid”). Mr. Arroyo is a manual worker. Neither is college-educated.
As persons of limited education living we may assume at or near the poverty line, the Arroyos probably are deferential to medical staff. Told by the staff only that their child’s injuries were the result of the mother’s infection, they could not have been expected to suspect that another cause was that the staff hadn’t administered antibiotics to her, and to conduct research into the risk and prevention of the transmission of a deadly infection from mother to child during childbirth. Suppose that, contrary to the court’s opinion, a person of average medical sophistication would have conducted an investigation that would have enabled suit to be filed before the statute of limitations expired. That should not defeat the Arroyos’ claim. When the question in applying the discovery rule in a malpractice case is what knowledge should be ascribed to the plaintiff, the court should either determine the knowledge of the particular plaintiff or make a judgment applicable to the subset of the population that has approximately the same educational background and socioeconomic status as the plaintiff.
Granted, this approach would require, though only in cases in which the statute of limitations was pleaded as a defense, that plaintiffs present evidence about their educational background and socioeconomic status, in lieu of a guess by judge or jury, based on no evidence, of the medical sophistication of the average American. See, e.g., Grand Trunk Ry. v. Ives, 144 U.S. 408, 417, 12 S.Ct. 679, 36 L.Ed. 485 (1892); Leon Green, “The Negligence Issue,” 37 Yale L.J. 1029 (1928). But why is that an objection rather than a confession that there is too much guesswork in American law and a clue that the traditional approach can produce absurd results when applied in a technical field — as in this case? For the government in its brief tells us — without references or other elaboration — that “from an objective standpoint, reasonably diligent persons are aware that infections can be prevented, particularly in hospital settings.” On the contrary, knowledgeable persons, fearful of hospital-based infections — see R. Monina Elevens et al., “Estimating Health Care-Associated Infections and Deaths in U.S. Hospitals, 2002,” 122 Pub. Health Rep. 160 (2007), www.ncbi.nlm.nih.gov/pmc/articles/PMC 1820440; Andrew Pollack, “Rising Threat of Infections Unfazed by Antibiotics,” N.Y. Times, Feb. 27, 2010, p. B1 — strive to minimize the amount of time they spend in a hospital because they know, unlike the authors of the government’s brief (if they believe what they wrote), that many infections in hospital settings cannot be prevented even with reasonable care. If “diligent” is a synonym for expert, as the government’s brief implies, the government is not a diligent student of hospital infection. How can it demand that the Arroyos have a level of medical expertise that the Department of Justice appears to lack?
I need to make clear that I am discussing only the standard for determining when the statute of limitations begins to run, not the standard of care. Kubrick *677 holds that the statute of limitations begins to run in a malpractice case when the plaintiff either discovers, or if diligent would have discovered, that he has been injured by the (at that point merely potential) defendant, and not when the plaintiff discovers or should have discovered that his injury was the result of negligence. This is not only the law; it is sensible. Even unsophisticated people, when they learn that they have been injured by a physician rather than (just) by the condition the physician was (or should have been) treating, should know that there may have been malpractice, and so should consult another physician, or other medical person, or a lawyer. Kubrick knew his injury might have been caused by a drug administered by the hospital; the question what level of sophistication should be assumed in deciding whether a patient should know that he has been injured by medical personnel was not before the Court. Weeks after being discharged from a Veterans Administration hospital in which he had been treated with an antibiotic called neomycin, Kubrick had “noticed a ringing sensation in his ears and some loss of hearing. An ear specialist ... diagnosed the condition as bilateral nerve deafness. His diagnosis was confirmed by other specialists. One of them ... secured Kubrick’s VA hospital records and in January 1969, informed Kubrick that it was highly possible that the hearing loss was the result of the neomycin treatment administered at the hospital.” 444 U.S. at 113-14, 100 S.Ct. 352 (emphasis added). So, the Court held, that was when the statute of limitations began to run.
Had someone informed the Arroyos that it was “highly possible” that the injuries to their child had been caused by the failure to administer antibiotics to Mrs. Arroyo, the statute of limitations would have begun to run then, just as in Kubrick. For they would have known, or in the exercise of reasonable diligence (reasonably understood in light of their socioeconomic position) should have known, that a cause of their child’s injuries might have been the failure of the doctors to administer antibiotics to Mrs. Arroyo; given that information, they would or should have known enough to consult a lawyer or other expert. That may be asking a lot of them; but to ask that they have suspected malpractice in the absence of any disclosure of the possibility of an iatrogenic injury would be to ask too much.
I anticipate the objection that the suggested approach would nullify the statute of limitations in many medical malpractice cases. The Arroyos missed the two-year statutory deadline by seven months; they might have missed it by a greater margin but for the happenstance of seeing a tort lawyer’s television commercial. The obvious answer would be to add a statute of repose to the Federal Tort Claims Act, as suggested in Kent Sinclair & Charles A. Szypszak, “Limitations of Action under the FTCA: A Synthesis and Proposal,” 28 Harv. J. Legis. 1, 59-60 (1991), and, in a slightly different context, by Justice Stevens in Kubrick, 444 U.S. at 129 n. 5, 100 S.Ct. 352 (dissenting opinion). He was arguing that the statute of limitations should not begin to run until the plaintiff knew or should have known not only that he had been injured, but also that his injury was caused by the defendant’s negligence — the argument the majority rejected. Statutes of repose are a common feature of medical malpractice law. See Branch v. Willis-Knighton Medical Center, 636 So.2d 211 (La.1994).
But if the Erie Family Health Center (or its backer, the United States) wants to avoid being hit by stale malpractice suits, it has only to level with patients (or in the case of a child, the patient’s parents) concerning possible causes of a medical injury. When the Arroyos’ child was discharged *678 from the hospital with brain injuries two months after his birth, the Center’s physicians told the parents only that their child’s injuries had been caused by an infection that Mrs. Arroyo had transmitted to him during his birth. They said nothing that might have alerted the Arroyos to the possibility that a medical act or omission had contributed to the infection. The physicians did not have to confess liability; indeed, at the trial the defense presented respectable evidence that there had been no negligence. All the Center would have had to do was give the Arroyos a reasonably full account of the circumstances of the child’s injuries — -that antibiotics could have been administered to the mother before the birth and to the child immediately after and that had this been done the injuries might have been averted, or been less serious. See Nemmers v. United States, supra, 795 F.2d at 631.
“According to recent codes and guidelines ... individual clinicians and institutions have an ethical responsibility to disclose unanticipated negative outcomes. Respect for personal autonomy entails disclosure of what occurred — even if no further medical decisions are involved — and of options to take nonmedical actions, including legal actions, if appropriate.” Tom L. Beauchamp & James F. Childress, Principles of Biomedical Ethics 294 (2009); see also American Medical Association, Code of Medical Ethics: Current Opinions with Annotations § 8.12, pp. 141-42 (1998). If a patient dies as a result of his physician’s failure to diagnose a readily diagnosable, and if diagnosed readily curable, condition, such as appendicitis, it is a deceptive half-truth to tell the grieving spouse or parents that the patient died of appendicitis; the patient’s death was jointly caused by appendicitis and medical negligence. Compliance with the ethical duty of disclosure of possible medical errors in simple, intelligible terms would give medically unsophisticated plaintiffs enough information to recognize that medical decisions might have contributed to their injuries.
I am not arguing that a breach of the ethical duty of disclosure is itself malpractice, although it could be if it prevented the patient from obtaining medical treatment that would mitigate the consequences of the original medical error. I am not arguing that the disclosure must go beyond an acknowledgment of the possibility of medical error and become a confession that there was a medical error; or that a doctor is required to explain that additional treatment might have avoided the patient’s injury if failure to provide that treatment would not have been negligent, because of the expense, side effects, or uncertain benefits of the treatment, as when a patient suffers an injury that would have been prevented had the doctor performed a battery of painful and expensive experimental tests. But if a potential defendant in a medical malpractice suit wants to take advantage of the statute of limitations he should have to disclose information known to him that would alert the patient to the possibility of an error. By doing that he can be sure that the statute of limitations will begin to run immediately (for that is what Kubrick holds) and not years later, though even without that precaution the statute of limitations might begin to run upon injury if the average member of the plaintiffs socioeconomic stratum would have realized that his injury might have been caused by medical staff rather than by (or just by) an illness.
I want finally to distinguish this case from one in which concealment is pleaded to i-ebut a defense that the statute of limitations has expired. The doctrine of “fraudulent concealment,” a form of equitable estoppel, tolls the statute of limitations during a period in which the defendant has taken steps to prevent the *679 plaintiff from filing his complaint until the statute of limitations expires; he might for example have promised not to plead the statute of limitations while the parties were negotiating a possible settlement. Wolin v. Smith Barney Inc., 83 F.3d 847, 850 (7th Cir.1996); Cada v. Baxter Healthcare Corp., 920 F.2d 446, 451 (7th Cir.1990). “Fraudulent concealment in the law of limitations presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant — above and beyond the wrongdoing upon which the plaintiffs claim is founded — to prevent the plaintiff from suing in time.” Id.; see also Harrison v. United States, 708 F.2d 1023, 1027-28 and n. 1 (5th Cir.1983).
The Supreme Court has not decided whether the statute of limitations in suits under the Federal Tort Claims Act is jurisdictional and therefore (by analogy to such cases as Bowles v. Russell, 551 U.S. 205, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007)) may not be tolled. Our court has not addressed the question either, and the courts of appeals that have done so are divided. Compare Marley v. United States, 567 F.3d 1030, 1034-37 (9th Cir.2009), with Santos ex rel. Beato v. United States, 559 F.3d 189, 194-97 (3d Cir.2009), and T.L. ex rel. Ingram v. United States, 443 F.3d 956, 959-61 (8th Cir.2006). There is no need to answer the question in this case, though I note the Supreme Court’s recent remark that filing deadlines, even in suits against the government, are presumptively not jurisdictional. Henderson ex rel. Henderson v. Shinseki, - U.S. -, 131 S.Ct. 1197, 1203, 179 L.Ed.2d 159 (2011). The concealment in this case occurred before rather than after the statute of limitations began to run, because the concealment of the fact that the doctors had contributed to the child’s injuries prevented the Arroyos from discovering the doctors’ causal role. The statute of limitations does not begin to run until that discovery is made or should have been made by a reasonable person of the plaintiffs’ educational and socioeconomic background. This is not a tolling case, so limitations on tolling are irrelevant.